**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| MICHAEL CARTER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:12-cv-00108-TWP-MJD |
| | ) |
| FAMILY VIDEO MOVIE CLUB, INC. doing | ) |
| business as FAMILY VIDEO, | ) |
| | ) |
| Defendant. | ) |

**ENTRY ON MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on Defendant Family Video Movie Club, Inc.'s ("Family Video") Motion for Summary Judgment (Dkt. 38). Plaintiff Michael Carter ("Mr. Carter") claims that Family Video violated the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101-12113, as amended by the ADA Amendments Act of 2008, Pub. L. No. 110-325, § 2(b)(1) (collectively, " the ADA") by failing to hire him as a Customer Service Representative. For the reasons set forth below, Family Video's Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part.

**I.   BACKGROUND**

The following material facts are not in dispute and are viewed in the light most favorable to Mr. Carter as the non-moving party. *See Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 728 (7th Cir. 2011). Family Video operates a chain of more than 750 video rental stores across nineteen states, including Store #245, located at 7301 Rockville Road, Indianapolis, Indiana ("the Rockville Store"), and Store #199, located at 9250 West 10th Street, Indianapolis, Indiana ("the Raceway Store"). Mr. Carter was a regular customer of the Raceway Store. Following a tragic

automobile accident in October 2001, Mr. Carter was diagnosed with T4-5 paraplegia and is permanently paralyzed, which requires him to use a wheelchair.

A.     **Family Video's Hiring & Employment Practices**

Family Video is not a franchisor; rather, the company owns all of its stores directly and employs all of the individuals who work in its stores.  Employees hired at one Family Video store frequently pick up shifts at other Family Video locations, and when a Family Video store becomes short-staffed, employees from other stores will help out.  Employees also transfer for promotional opportunities, to help train staff at other locations, or for personal reasons.  However, hiring decisions are made independently at each location.

Family Video places a heavy emphasis on customer service, which is addressed throughout its Employee Handbook.  Family Video believes its commitment to customer service provides a competitive advantage over "no service" video rental options, such as Netflix and Redbox.  To carry out this goal, Family Video places an emphasis on hiring "friendly, intelligent, positive people, then giv[ing] them the ability to think and solve problems."  Dkt. 39-3 at 8.  In addition to their customer service responsibilities, all Family Video employees are required to perform a variety of operational and maintenance functions in the store, including checking out customers, processing applications for memberships, handling customer service issues, giving store tours, returning videos to the walls and shelves, conducting inventory, cleaning the store and restrooms, taking out the trash, keeping the parking lot clear, and changing light bulbs when they burn out.  During certain times, Family Video stores may be staffed with only one employee who must be able to perform all of these tasks.

Family Video's interviewing and hiring policies are set forth in a document called the S.T.A.R. Binder.  The S.T.A.R. Binder indicates that interviews should be conducted in two

phases. Phase one includes biographical questions on topics such as school, family, and free time, and is intended to give the interviewer the opportunity to assess whether the applicant has the six "Qualities a Person Should Have." The six qualities outlined in the S.T.A.R. Binder include 1) friendly; 2) outgoing; 3) sensitive; 4) ambitious; 5) energetic; and 6) good appearance. The first phase of the interview is considered the "meet and greet" interview, and typically lasts between five and ten minutes. The interview is designed to allow the store manager to assess the candidate's work ethic, friendliness, self-motivation, enthusiasm, communication skills, and other qualities that Family Video believes are important to provide good customer service. If the candidate displays the qualities the manager has been trained to look for, the manager may extend the "meet and greet" into a phase two full interview; if not, the manager is trained to end the interview after the phase one questions. The applicant will not receive further consideration for employment, and the manager typically informs the applicant that Family Video is still interviewing other candidates. If an applicant does satisfactorily display the six qualities during the interview process, the next step in the hiring process is for the applicant to take a general clerical test. If the applicant passes the clerical test, Family Video checks the applicant's references, followed by a final interview with the District Manager who makes all final hiring decisions in the district.

Family Video requires everyone interested in working in one of its stores to fill out an application for that store. The Rockville and Raceway Stores accept electronic applications, either through Family Video's website or by using the kiosk located in each store. Each application is reviewed by a member of the store management, and a manager will typically contact applicants he or she wants to interview within a day or two to schedule an initial "meet and greet" interview in the store. Family Video calls a high percentage of applicants into the

stores for "meet and greet" interviews; however, only a small percentage of applicants pass the "meet and greet" interview phase.

**B.     Mr. Carter's Application to Family Video**

From 1992 until approximately 2002, Mr. Carter was employed in the furniture rental business in the areas of delivery, sales and customer service. After the 2001 automobile accident, Mr. Carter was absent from the workforce for several years. In anticipation of rejoining the workforce, Mr. Carter completed training in the job interview process through Crossroads Rehabilitation Center.

Since 2006, Mr. Carter has been a frequent customer of the Raceway Store location and has had numerous casual conversations with the Raceway Store manager, Phil Scott ("Mr. Scott"). During one of his regular visits to the Raceway Store in January 2010, Mr. Carter had a conversation with Mr. Scott and inquired about applying to work as a part-time Customer Service Representative. Mr. Scott did not direct Mr. Carter to apply online or at the store's application kiosk, but instead informed Mr. Carter that he would not be able to work at the Raceway Store because "you have to be able to change light bulbs." Assuming this comment was an isolated incident, Mr. Carter submitted an online application for a position at the Rockville Store on February 18, 2010. His application indicated that he was seeking a part-time position at the Rockville Store, and that he had not previously applied to a Family Video store. Jennifer Heilman, the assistant manager at the Rockville Store, reviewed Mr. Carter's application, and on February 19, 2010, Ms. Heilman scheduled him for a "meet and greet" interview with store manager Amanda Watson ("Ms. Watson").

On February 24, 2010, Mr. Carter arrived at the Rockville Store in his wheelchair for the interview. When Mr. Carter informed Ms. Watson that he was there for his interview, her jaw

dropped and she responded, "okay, nice to meet you." Ms. Watson reviewed Mr. Carter's application for the first time on the day of the interview and noticed that it contained several typographical errors and that he had an eight year gap in his employment history. Ms. Watson directed him to the game room where there were not many customers, as Family Video stores do not have offices or break rooms in which to conduct interviews. Ms. Watson asked Mr. Carter a series of basic interview questions, including about his first job, school, home life, and greatest accomplishment. Mr. Carter admits that he was very quiet during the interview, and gave brief responses to Ms. Watson's questions, in part because the interview was being conducted in the game area where customers were present. After about five minutes, Ms. Watson concluded the interview by informing Mr. Carter that Family Video was still interviewing candidates and would contact those individuals it was interested in pursuing further in a few days. On that same day, Ms. Watson indicated on Mr. Carter's electronic application that he would not be hired based upon his interview and noted "very quiet, hardly smiled" in the comment section of his application. Several days after his interview, Mr. Carter called the Rockville Store to follow-up on his application. At the time, Ms. Watson falsely told Mr. Carter that someone had transferred from another store and they were no longer seeking new employees at the Rockville Store. However, Family Video subsequently hired Brooke Redford in April 2010 based upon the friendly and enthusiastic personality that she displayed during her interview and her good appearance. Additional facts will be addressed below as necessary.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

5

party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "In much the same way that a court is not required to scour the record in search of evidence to defeat the motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation and internal quotations omitted). "[N]either the mere existence of some alleged factual dispute between the parties . . . nor the existence of some metaphysical doubt as to the material facts . . . is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and internal quotations omitted).

### III. DISCUSSION

Mr. Carter claims that Family Video discriminated against him based upon his disability by failing to give him fair consideration for employment opportunities at the Raceway Store, and refusing to hire him at the Rockville Store because he is in a wheelchair. Unlawful discrimination under the ADA includes discrimination on the basis of disability with regard to job application procedures, hiring, and the failure to provide reasonable accommodation. 42 U.S.C. § 12112(a), (b)(5)(A). In order to challenge such activity under the ADA, the plaintiff must meet the definition of a "qualified individual with a disability." 42 U.S.C. § 12112(a); *see also* 29 C.F.R. § 1630.4; *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir.

1996). Family Video argues that Mr. Carter cannot establish a *prima facie* case for failure to hire at the Raceway Store because he never filled out an application for that store, and the failure to hire him at the Rockville Store was not for discriminatory reasons.

In order to defeat summary judgment on his ADA claim, Mr. Carter must establish discrimination using either the direct or indirect methods. *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011). Under the direct method, the plaintiff can present either direct evidence of discrimination, which requires an admission by the decision maker that his or her actions were based upon discriminatory *animus*, or by presenting circumstantial evidence that would allow a jury to infer intentional discrimination. *Id.* Under the indirect method of proof, a plaintiff must establish a *prima facie* case of discrimination by showing: 1) he is a member of a protected class; 2) he applied for and was qualified for an open position; 3) he was rejected for the position; and 4) the position was filled with a person not in the protected class who had similar or lesser qualifications than the plaintiff. *Grigsby v. LaHood*, 628 F.3d 354, 358 (7th Cir. 2010). The burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for not hiring the plaintiff. *Id.* Once this burden is met, the plaintiff must prove that the employer's stated reason is pretext for intentional discrimination. *Id.* The Court will address each of Mr. Carter's claims in turn.

**A.     Failure to Hire at the Raceway Store**

Mr. Carter asserts that he can bring a failure to hire claim against Family Video based upon his conversation with Mr. Scott at the Raceway Store, despite acknowledging that he did not fill out an actual application for a position at that location. This claim fails as a matter of law because Mr. Carter never applied to the Raceway Store, and therefore could not have been considered for employment. In order to bring a failure to hire discrimination claim, the plaintiff

must actually apply for a position that requires an application to be considered for employment. *Loyd v. Phillips Bros., Inc.*, 25 F.3d 518, 523 (7th Cir. 1994). "If an employer has a 'formal system of posting job openings and allowing employees to apply for them,' then the employee's failure to apply for an open position 'would prevent [him] from establishing a *prima facie* case.'" *Coleman v. City of Chi.*, No. 02 C 4141, 2003 WL 22057018, at *6 (N.D. Ill. Sept. 4, 2003) (quoting *Box v. A & P Tea Co.*, 772 F.2d 1372, 1376 (7th Cir. 1985)). It is undisputed that Family Video requires all prospective employees to submit an application to be considered for employment, and Mr. Carter only submitted an application for a position at the Rockville Store.

Mr. Carter argues that he did not submit an application to the Raceway Store because he believed it would have been futile. However, regardless of whether a plaintiff is discouraged from applying for a position, an informal expression of interest in a position will not substitute for an application for employment where the employer's hiring process requires one. *See Mitchell v. Old Nat'l Bank*, No. 3:07-cv-00167-RLY-WGH, 2010 WL 561804, at *6 (S.D. Ind. Feb. 9, 2010) ("[A]llegations that an employer discouraged a plaintiff from applying for a position and led her to believe she had no chance of getting the opening do not relieve an employee from her obligation to show that she applied for the position."); *Wilkerson v. Menard, Inc.*, No. 2:08-cv-0026, 2009 WL 1011099, at *6 (N.D. Ind. Apr. 15, 2009) (plaintiff could not maintain failure to hire action when she had not formally applied for the position despite clearly expressing interest); *Russell v. Eli Lilly & Co.*, No. TH01-0160-C T/H, 2002 WL 31427441, at *2 (S.D. Ind. Oct. 16, 2002) ("Plaintiff testified she did not apply for other positions because she was discouraged and believed she had no chance of being promoted. The failure to apply is fatal to any claim based on a failure to promote to such other positions."); *cf. Lloyd*, 25 F.3d at 523 (application not required where promotion recommendations were made upon the initiative of

the company). Additionally, Mr. Carter's statement that he believed that Mr. Scott's comment was a one-time occurrence, leading him to apply at another Family Video location, does not demonstrate that Family Video had a known policy of not hiring disabled applicants. *Cf. E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1275 (11th Cir. 2002) (futility doctrine applied where restaurant had known policy in the community of only hiring male servers). Therefore, Mr. Carter cannot bring a claim for failure to hire based only upon his expressed interest in working at the Raceway Store, or his belief that an application at the Raceway Store would have been futile based upon Mr. Scott's comment. Family Video's motion is **GRANTED** on this claim.

### B.     Failure to Hire at the Rockville Store

Next, Mr. Carter argues that he can establish a *prima facie* case of disability discrimination for Family Video's failure to hire him at the Rockville Store location. To establish a prima facie case under the ADA in a failure to hire case, a plaintiff must show: (1) that he is a disabled person within the meaning of the ADA; (2) that he is qualified, that is, he is able to perform the essential functions of the job, with or without reasonable accommodation; and (3) that the employer failed to hire him under circumstances which give rise to an inference that the failure to hire was based on his disability. *See Morgan v. Hilti*, 108 F.3d 1319, 1323 (10th Cir. 1997) (citations omitted).

There is no dispute that Mr. Carter can show that he was a member of a protected class because he is in a wheelchair, that his application for employment at the Rockville Store was rejected, and that Family Video filled the position with someone outside of his protected class when it hired Brooke Redford for the position. However, the parties dispute whether Mr. Carter can satisfy the second prong of his *prima facie* case and show that he was qualified for the

Customer Service Representative position, which also calls into question whether Mr. Carter was a "qualified individual" under the ADA.

### 1. Is Mr. Carter a "qualified individual" under the ADA?

In order to receive protection under the ADA, an applicant must be a "qualified individual." A "qualified individual" is defined, in relevant part, as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Whether someone meets the definition of a "qualified individual" under the ADA involves a two-step determination. 29 C.F.R. app. § 1630.2(m). First, the court considers whether the individual "satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc." *Id.* The ADA does not shelter disabled individuals from adverse employment actions "if the individual, *for reasons unrelated to his disability* (such as a poor work ethic . . . or unprofessional demeanor), is *not qualified* for the job or is *unable to* . . . fulfill the requirements of the position as prescribed by the employer." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 862 (7th Cir. 2005) (emphasis in original). If the individual satisfies these requirements, then the court must consider "whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation." 29 C.F.R. app. § 1630.2(m). The determination as to whether an individual is a "qualified individual" must be made as of the time of the employment decision. *Id.* The plaintiff bears the burden of proof on this issue; he must be able to show that he is a "qualified individual with a disability" in order to successfully prosecute an ADA claim. *Bombard*, 92 F.3d at 563 (citing *DeLuca v. Winer Indus., Inc.*, 53 F.3d 793, 797 (7th Cir. 1995)).

In determining whether an applicant is qualified for a position, consideration is given to the employer's judgment as to what functions of the job are "essential," and an employer's written description of the job prepared before advertising the position or interviewing applicants is considered evidence of the essential functions of the job. 42 U.S.C. § 12111(8). "An employer may define the job in question, 'in terms of both its essential scope and the qualifications required for it,' . . . as long as such qualifications are 'job-related and consistent with business necessity.'" *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 929 (7th Cir. 2001) (quoting *Bay v. Cassens Trans. Co.*, 212 F.3d 969, 974 (7th Cir. 2000)) (additional citations omitted).

With respect to the position at the Rockville Store, Family Video asserts this claim fails because Mr. Carter cannot show that he was qualified for the position. Family Video says Mr. Carter was not hired because he did not display an "enthusiastic and outgoing personality" that it expects of all of its employees. Mr. Carter does not dispute the fact that Family Video heavily emphasizes customer service, and that it is Family Video's policy to hire friendly, enthusiastic and outgoing individuals. This requirement is stated throughout Family Video's Employee Handbook and in the S.T.A.R. Binder, and was established well before Mr. Carter applied for the Customer Service Representative position. Dkts. 39-3 at 2-29; 46-6 at 10. At the time of Mr. Carter's interview, Ms. Watson noted on his application that he was "very quiet and hardly smiled". In his deposition testimony, Mr. Carter confirmed that he was indeed quiet. Dkts. 39-6 at 4; 39-11 at 45, 43:14-20. However, he says was quiet because the interview was held in the game room and Mr. Carter did not want the store's customers to overhear his interview, especially when answering personal questions about his family.

Family Video has demonstrated that a friendly, outgoing personality is essential to the job of Customer Service Representative, and there is a business necessity for such a requirement. But the Court is not convinced that Mr. Carter is not a "qualified individual" able to perform the duties of a customer service representative. Afterall, the circumstances of the interview being held in the game room were hardly conducive to smiling or speaking loudly. Mr. Carter asserts that during his interview, a customer actually bumped into the back of his wheelchair. Dkt. 39-1 at 43. Mr. Carter says he possesses the requisite skills and experience necessary for the job and disputes that he lacks a friendly and outgoing personality. Before his disabling accident, Mr. Carter had almost 10 years of experience as a customer service representative and he had recently completed training at Crossroads Rehabilitation Center to hone his interview and work skills.

As for the second inquiry, whether Mr. Carter can, despite his impairments, perform the essential functions of the job either with or without reasonable accommodations, the Court believes a reasonable jury could conclude that he can. If Mr. Carter is required to change light bulbs, a reasonable accommodation can be made as he can use an assisting device. Further, Ms. Watson herself testified that she believed Mr. Carter could perform the functions of the job with accommodation. (Watson Dep. 74:5-13). Applying the two-step analysis, Mr. Carter has presented sufficient evidence that he is "qualified" for the customer service position and a reasonable accommodation would enable him to perform all of the essential functions of the position. The record establishes contested facts as to whether Mr. Carter was a qualified individual. Based on these factors, the Court finds Mr. Carter has presented evidence that he is a "qualified individual" under the ADA, and he has satisfied the second prong of his *prima facie* case.

### 2. Has Mr. Carter has shown that Family Video's proffered reason is pretext?

Mr. Carter must next show by a preponderance of the evidence that Family Video's proffered reason for its failure to hire him was pretext for discrimination. A plaintiff may establish pretext by proving one of the following: "(1) the proffered reasons are factually baseless; (2) the proffered reasons were not the actual motivation for the [adverse action]; or (3) the proffered reasons were insufficient to motivate the [adverse action]." *Wolf v. Buss (Am.), Inc.*, 77 F.3d 914, 919 (7th Cir. 1996). Family Video's stated reason for its failure to hire Mr. Carter was due to his demeanor during the meet and greet interview. As stated above, Mr. Carter does not dispute that he was quiet nor does he dispute that Family Video places a strong emphasis on its employees being outgoing and friendly as an essential part of the Customer Service Representative position. Mr. Carter argues that other circumstances prove that Family Video's proffered reason was not the actual motivation for its failure to hire him.

First, he argues that Mr. Scott's statement regarding his inability to work at the Raceway Store because he could not change light bulbs is evidence of discriminatory *animus*. However, a remark revealing discriminatory *animus* can only create an inference of discrimination if it was made by the decision-maker around the time of the decision and referred to the challenged employment action; if not, the plaintiff must establish that the person who made the comment had the ability to influence the decision. *Mach v. Will Cnty. Sheriff*, 580 F.3d 495, 499 (7th Cir. 2009). Mr. Carter has not shown that Mr. Scott had any influence on Ms. Watson's decision not to further interview Mr. Carter, and the comment was made several weeks before Mr. Carter applied to the Rockville Store. Dkt. 39-11 at 56-57, 55:14 – 56:4.

Second, Mr. Carter argues that Ms. Watson conducted his interview differently from other applicants, as he felt rushed during his interview. However, according to Family Video's

interviewing and hiring policies in the S.T.A.R. Binder, managers are trained to end the interview after the first few biographical questions if the interviewee does not display the desired qualities, which typically takes about five to ten minutes. Dkts. 39-2 at 5, ¶15; 39-9 at 23, 22:18-25; 46-2 at 7. Mr. Carter stated that his interview lasted about five or six minutes, during which he was "trying to be a little bit quiet during the interview, as to not interrupt the customers that were in the area" and he did not want to vocalize his personal business. In accordance with Family Video's policies, Ms. Watson says she was to terminate the interview. Aside from speculation regarding Ms. Watson's demeanor during the interview, Mr. Carter has not shown that there were any differences between his interview and interviews conducted with applicants outside of his protected class, nor does he even know whether his interview was actually conducted differently than non-disabled applicants. Dkt. 39-11 at 65-66, 85:12 – 86:5.

Finally, Mr. Carter alleges that Family Video's proffered reason for not hiring him was pretext and insufficient to justify the adverse action. Family Video maintains that Mr. Carter's poor performance at the interview, not his wheelchair, made him undesirable for the position. Poor performance at an interview has been held to be a legitimate basis for failure to hire or promote, and the Seventh Circuit has stated that the court does not sit as a "superpersonnel department that reexamines an entity's business decisions." *Baron v. City of Highland Park*, 195 F.3d 333, 341 (7th Cir. 1999) (quoting *Lindemann v. Mobil Oil Corp.*, 141 F.3d 290, 300 (7th Cir. 1998)). Courts cannot force an employer to hire an applicant that does not meet its needs. *Id.*

But, because the employer's motive and intent are at the heart of a discrimination case, the central inquiry "is whether [disability] was a factor in the employment decision *at the moment it was made.*" *E.E.O.C. v Wal-Mart Stores, Inc.*, 477 F.3d 561, 570 (8th Cir. 2007)

(emphasis in original).  According to Family Video, Mr. Carter did not display the qualities that they seek in its employees during his interview for the Rockville Store position, despite his assertions that he received interview training and performed well in interviews with other companies.  As evidence of pretext, Mr. Carter asserts that Ms. Watson's untruthfulness when she told him the position had been filled when it had not, and that Family Video had hired from within demonstrates a discriminatory motive.  "A showing by the plaintiff that his employer lied about the reason for its action may support an inference that the employer's real motive was discriminatory."  *Onuorah v. Kmart Corp.*, 102 F. Supp. 2d 992, 996 (S.D. Ind. 1999) (*citing Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 984 (7th Cir. 1999)).  Because a fact-finder may infer intentional discrimination in violation of ADA from an employer's untruthfulness, "evidence that calls truthfulness into question precludes a summary judgment." *Cleveland v. Prairie St. Coll.*, 208 F. Supp. 2d 967, 983 (N.D. Ill. 2002) (*citing O'Neal v. City of New Albany*, 293 F.3d 998, 1005 (7th Cir. 2002)).

     Mr. Carter also points out that Ms. Redford, an applicant outside of the protected class, submitted an online application which contained as many typographical errors as his application.  Additionally, Ms. Watson indicated the eight year gap in Mr. Carter's work history was cause for concern regarding his experience; however Ms. Redford's application shows that she had very minimal experience having previously worked for only four months at a Victoria's Secret store and eight months at a Wal-Mart store.  Family Video says Ms. Redford was hired based on her appearance and demeanor during her interview.  She is described in the Applicant Log as "NICE LOOK.  BRIGHT AND CHEERY."  Mr. Carter asserts that Family Video's focus on physical appearance as criteria for the Customer Service Representative position—in particular the emphasis that employees should "stand straight and tall" and "walk with a purpose"—influenced

15

Ms. Watson's decision to not allow him to proceed to the next step in the interview process. He argues a reasonable jury could find Family Video's focus on appearance in the hiring decision for the position to be a pre-textural rationalization for not hiring a disabled person confined to a wheelchair. Additionally, Mr. Carter stated that Ms. Watson had a shocked expression and her "jaw dropped" upon seeing him arrive for his interview in his wheelchair, which he asserts is evidence of discriminatory intent. While the Seventh Circuit has held that demeanor evidence alone does not create an inference of discriminatory motive, *Grigsby*, 628 F.3d at 358, it is still circumstantial evidence that a jury could consider in determining whether the Family Video's stated reasons for not hiring him were pretext for discrimination.

Mr. Carter has demonstrated sufficient evidence from which a jury could find that Family Video's proffered reasons for not hiring him were pretext for discrimination. While the alleged discriminatory actions separately may not rise to the level of pretext, based on the totality of circumstances, a reasonable jury should be allowed to determine whether Mr. Carter's demeanor – his failure to smile, and speak loudly – were the actual motive for Family Video's decision to not proceed with his interview process or to hire Mr. Carter as a part-time Customer Service Representative. Summary judgment on this claim is therefore **DENIED**.

## IV. CONCLUSION

Mr. Carter has shown that there are disputes of material fact that would preclude summary judgment on his ADA claim for failure to hire at the Rockville Store. He has demonstrated that he can meet the definition of a "qualified individual" under the ADA, and Mr. Carter has presented evidence that Family Video's proffered reason for not hiring him was pretext for discrimination. For the forgoing reasons, Family Video's Motion for Summary Judgment (Dkt. 38) is **GRANTED** with respect to the claim for failure to hire based only upon

his expressed interest in working at the Raceway Store, and **DENIED** with respect to the claim at the Rockville Store.

The parties are directed to contact the Magistrate Judge to discuss rescheduling of the settlement conference, final pretrial conference and trial date. (See Dkt. 59).

**SO ORDERED.**

Date: 08/02/2013

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Quincy Erica Sauer
MACEY SWANSON & ALLMAN
qsauer@maceylaw.com

Michael L. Mulhern
WINSTON & STRAWN, LLP
mmulhern@winston.com

Barry A. Macey
MACEY SWANSON AND ALLMAN
bmacey@maceylaw.com

Brian L. McDermott
OGLETREE, DEAKINS, NASH, SMOAK & STEWART
brian.mcdermott@odnss.com

Daniel J. Fazio
SEYFARTH SHAW LLP
dfazio@winston.com

Jonathan E. Rosemeyer
WINSTON & STRAWN, LLP
jrosemeyer@winston.com